**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

ANTHONY BOYKINS,

    Petitioner,

v.                                                   Case No. 3:17-cv-482-J-32JBT

SECRETARY, FLORIDA
DEPARTMENT OF CORRECTIONS,
et al.,

    Respondents.

## ORDER

**I.  Status**

Petitioner, an inmate of the Florida penal system, initiated this case by filing a pro se Petition for Writ of Habeas Corpus Under 28 U.S.C. § 2254. Doc. 1. He is challenging a state court (Seminole County, Florida) judgment of conviction for which he is serving a life term of incarceration as a Prison Releasee Reoffender. See id. at 1. Petitioner raises a claim of newly discovered evidence in the form of a sworn statement from Marlon Fleming, who states he committed the crime for which Petitioner was convicted. Id. Respondents have

filed a Response.[1] Doc. 9. And Petitioner has filed a Reply. See Doc. 11. This case is ripe for review.

## II. Evidence at Trial

At trial, Dexter Brown testified that on November 12, 1999, he was arranging an extramarital rendezvous with Kimberlyn Davis at the Days Inn in Sanford, Florida. Resp. Ex. M at 219. He stated that around 10:00 p.m., he and Davis went to the hotel to stay the night together, and when they arrived, Brown realized he did not have identification to rent a room, so he left the hotel to pick up his cousin to rent the room for them. Id. at 220. Once Brown's cousin was able to secure the hotel room, Davis went to the room while Brown drove his cousin back home. At that time, Brown was driving a blue Ford Taurus with special and distinct tire rims. Brown testified that removing the tire rims required a special key.

After dropping off his cousin, Brown returned to the hotel and went to the room where Davis was waiting. Id. at 228. Brown testified that he knocked on the hotel room door, and when it opened, Brown was met by a chrome automatic pistol pointed directly at his head. Id. at 229, 230. He stated that he could see the entire gun except for the handle. Id. at 259. Brown testified that the hotel

---

[1] Respondents have also filed exhibits. See Docs. 10-1 through 10-9. The Court cites to the exhibits as "Resp. Ex."

2

hallway lights, and room lights were on and he could see inside the room's doorway. Id. He also explained that he could see the face of the individual pointing the pistol at him and he recognized the individual as Pookie, a male that Brown knew from the community and had seen prior to that date. Id. Brown then made an in-court identification of Petitioner as the person he knew as Pookie and identified Petitioner as the individual who pointed the gun at Brown's head on the night of November 12, 1999. Id. at 230.

Brown testified Petitioner was not wearing a shirt nor was Petitioner wearing a mask or hat during the attack. Id. He stated three other individuals were waiting inside the hotel room, as well. Id. Brown stated he was sure Petitioner was the individual who had the gun, but he never saw the faces of the other assailants and he was not sure if Davis was in the room during the attack. Id. at 232-33. According to Brown, he did not clearly see the faces of the other individuals because as soon as he opened the door, Petitioner grabbed Brown and they engaged in a "scuffle" before Petitioner pulled Brown inside the hotel room and pushed him facedown onto the floor. Id. at 231. Brown testified the other individuals and Petitioner then hit Brown over the head with the pistol, kicked him, and proceeded to check his pockets, before taking Brown's beeper, $400 cash, his car keys, and phone. Id.

Brown stated all the assailants then left the hotel room, and once they were gone, Brown ran out of the room and immediately saw a white male

standing on the nearby balcony of the hotel. Id. at 234-35. Brown asked to use the man's cell phone but the man, noticeably too scared to get involved, refused. Brown eventually called 911 from a phone at a nearby Denny's restaurant. Id. at 234. While speaking to the 911 dispatcher, Brown immediately identified his assailant by using Petitioner's street name – Pookie. Id. at 279. Brown testified that the day after the robbery, he saw Davis and Petitioner together, and Brown and Petitioner exchanged "loud words." Id. at 260. He also testified that several weeks after the robbery, police presented Brown with a photo lineup and Brown identified Petitioner as the person who robbed him. Id. at 251. Brown testified that when he made that photo identification, he was positive of his identification. Id. at 252.

Christopher Odom testified that on November 12, 1999, he was staying at the Days Inn in Sanford, Florida, while finishing a nearby construction job. Id. at 327. He stated that around 10:00 or 10:30 p.m. that night, he was grilling hamburgers on the balcony right outside his hotel room when he noticed a vehicle with distinct car rims pull into the parking lot. Id. at 327. Odom stated he saw a black male get out of the vehicle and walk to a hotel room door about six or eight rooms down from where Odom was grilling. Id. at 330. Odom saw the black male knock on the door and begin to walk inside when another black male pushed him back and began shaking him while demanding money. Id. Odom explained he saw two more black males come out of the hotel room and

4

grab the man before pulling him inside room. Id. at 331. According to Odom, twenty to thirty seconds later, he saw three black males and one black female exit the hotel room and begin to go downstairs. Id. Odom stated he did not get a good visual of the assailants' faces but did see one of the three black males was shirtless, wearing white shorts, a pair of tennis shoes, and had a gun stuffed in the front waistband of his shorts. Id. at 333. Odom testified that the male who was shirtless was "[f]ive-eight, five-nine[,] [m]aybe five-ten," about 175 pounds, and muscular. Id. at 355-56. He stated the other two men were wearing dark shirts and dark shorts and were both about 170 pounds. Id. Odom asserted none of the assailants were wearing masks. Id. at 339.

He testified that the three males and female quickly walked toward the car with the distinct tire rims and the two males in dark clothing began to search through the car while the male with no shirt and the female stood watch. Id. at 335. He asserted that while they were in the parking lot, the female looked up at Odom, but none of the three males looked in Odom's direction. Id. at 352. Odom stated he did not know if they removed anything from the car, and approximately thirty seconds later, a gray station wagon pulled up and the four individuals got into the gray car and drove away. Id. 336. He said a fifth individual was driving the gray getaway car. Id. at 343.

Odom stated that at some point after the assailants left the hotel room, the male he saw getting attacked came out of the room and ran to Odom and

5

asked to use Odom's phone to call 911. Id. Because Odom was scared and had seen that one of the male assailants had a gun, Odom refused to give Brown his phone but directed Odom to the front desk. Id. After the assailants drove away, the victim came back around to where Odom was standing, and they waited on the police to arrive. Id. at 338. Odom stated that while they were waiting, he found Brown's car keys and beeper laying nearby. Id. Odom returned the items to Brown. Id.

James Morris testified he has known Petitioner all of his life and had seen Petitioner and Davis "around together" and knew Davis was Petitioner's girlfriend. Id. at 317-18, 321. Morris also stated Petitioner knew Morris's cell phone number and explained that one evening, Petitioner called Morris's cell phone twice asking if Morris had a key to unlock a tire rim, or if Morris knew anyone who did have a rim key. Id. at 305. Morris testified he did not participate in facilitating the robbery of Brown and only learned that a robbery had occurred after the incident. Id. at 304. He also could not recall the exact date Petitioner made these two phone calls but could confirm that he received the two phone calls between November 1999 and May 2000. Id. at 313.

Daniel Prast, an investigator with the Sheriff's Office, testified he responded to the crime scene on the night of the incident. Id. at 388. Prast stated Brown told him that Brown knew the man who committed the robbery and identified the gunman by his street name – Pookie. Id. at 389. According to

6

Prast, Brown advised he knew Pookie prior to the robbery and that Pookie was from Sanford. Id. at 390. Prast explained that in the weeks following the robbery, he discovered that Petitioner was the only individual in the community with the nickname Pookie. Id. Prast testified Brown "most definitely" indicated that he would be able to recognize the assailant's photograph if presented to him, so Prast presented Brown with a six-photo lineup. Id. Prast stated Brown identified Petitioner's photo without hesitation. Id. at 392. Prast also testified that approximately one month after the robbery, he obtained the telephone records for room 258 of the Days Inn, the room in which the robbery took place. Id. at 393-94. According to the phone records, two calls were made from the hotel room to number 340-3565, the same cell phone number that Morris testified belonged to him. Id. at 303, 393-94. The first call was made at approximately 10:20 p.m. and the second call was made at 10:22 p.m. Id. at 393-94. Prast also corroborated Odom's initial statement to police that one of the assailants had on white shorts, no shirt, and a handgun in his waistband. Id. at 418.

Following Prast's testimony, the state presented to the jury a recording of Brown's 911 call. Id. at 425-27. During the call, Brown stated he was at the Days Inn with a friend, and he believed that his friend's boyfriend followed them to the hotel. Id. at 426. He exclaimed that the assailants took his money and car keys and believed that they also took his blue Ford Taurus. Id. at 426-27. When

7

the dispatcher asked Brown to describe the assailants, he replied: "One of them they call him Pookie." Id. at 426-27.

Once the state rested its case, defense counsel advised the trial court that Davis was present and ready to testify as a defense witness. Id. at 429-30. However, after having a thorough discussion with Petitioner about calling Davis as a witness and after giving Petitioner advice on the decision, counsel explained to the trial court that Petitioner and defense counsel agreed not to call Davis as a witness. Id. at 430. Petitioner also declined to testify on his own behalf at trial.

The jury found Petitioner guilty of armed robbery. Id. at 519. And the trial court adjudicated Petitioner as a Prison Releasee Reoffender and sentenced him to the mandatory term of life imprisonment. Id. at 571. Petitioner sought a direct appeal, and the Fifth District Court of Appeals affirmed Petitioner's judgment and sentence through a written opinion. Boykins v. State, 783 So. 2d 317 (Fla. 5th DCA 2001).

### III. **Petitioner's Claim of Newly Discovered Evidence**

Petitioner raises one ground in his Petition – that he is in receipt of newly discovered evidence showing he is actually innocent of the armed robbery for which he was convicted. See Doc. 1. According to Petitioner, on November 16, 2015, while incarcerated at Apalachee Correctional Institution, he received from the Office of the State Attorney for the Eighteenth Judicial Circuit Marlon

8

Fleming's November 6, 2015, sworn verbal testimony confessing to the offense.[2] See Doc. 2-3; see also Resp. Ex. N.

In the statement, Fleming advised he is also an inmate at Apalachee Correctional Institution with a current release date of 2058. Resp. Ex. N at 3. According to Fleming, throughout 1999 he was on a "robbery spree" in Seminole County and Orange County. Id. at 6. He claimed that in June 1999, he began dating "Kimberly Brown [sic]"[3] and explained that several other people were also dating Kim during that time, including "Pookie" and "Dexter." Id. at 5. Fleming stated that when Kim learned Fleming was on a "robbery spree," she began assisting in the robberies by "setting dope boys up." Id. at 6.

Fleming asserted that in October 1999, Kim told Fleming that Brown was dealing a large quantity of drugs, so Fleming asked Kim to "set up" a robbery. Id. at 6-7. Fleming stated that on November 12, 1999, around 10:15 or 10:20 p.m., Kim contacted Fleming by calling Morris's cell phone, because Fleming's phone was charging at his father's house and Kim knew that Fleming was with Morris. Id. at 7. According to Fleming, Kim advised that she was at the Days

---

[2] In October 2015, Fleming provided the state with an affidavit confessing to the crime. Resp. Ex. N at 3-4. Upon receipt of the affidavit, Assistant State Attorney Thomas Hastings, Esquire, met with Fleming and received his sworn, in-person "investigative statement." Id. Petitioner relies on the transcript of Fleming's in-person statement to support his claim.

[3] Fleming never mentions a "Kimberlyn Davis," but refers to the subject female as "Kimberly Brown" and "Kim." See generally Resp. Ex. N.

9

Inn with Brown, so Fleming, Morris, and Germane Jackson (or Genny Mae) immediately headed to the hotel to conduct the robbery. Id. Fleming stated that about three minutes later, Kim called Morris's cell phone a second time to advise that Brown was on his way back to the hotel after dropping his cousin off at home, so Fleming needed to hurry. Id. at 7-8.

Fleming claimed that once they arrived at the hotel, Kim let him, Morris, and Genny Mae into room "257 or 258" and Fleming hid behind the door while the others hid in the bathroom. Id. at 8. According to Fleming, when Brown got back to the hotel room, Fleming grabbed Brown and held a 380-caliber gun to him. Id. Fleming stated they began to wrestle just outside the hotel room and "f[ell] over the balcony." Id. He testified that because other people were outside and saw Fleming and Brown fighting, they "eventually came back inside the hotel room" where Brown overpowered Fleming until Morris and Genny Mae could jump out of the bathroom to help. Id. Fleming averred that once he was able to take Brown's car keys and cell phone, Fleming told Morris and Genny Mae to hold Brown hostage in the hotel room at gunpoint while Fleming searched Brown's car. Id. at 9. Fleming also stated that Kim "played the role as i[f] she was being robbed too . . . ." Id.

According to Fleming, he alone went outside to Brown's "2002" blue Ford Taurus, took $1,800 from the arm console and nine ounces of cocaine from the glove compartment. Id. at 9, 18. He stated he then went back to the hotel room,

10

got Kim and the others before getting into their stolen gray Buick LeSabre and driving away. Id. Fleming stated he left Brown's car keys and cell phone in the parking lot and took the cocaine and cash. Id. at 16. Fleming testified Morris was driving when they left the hotel. Id. at 9. Fleming testified he and the other assailants were dressed "in dark clothes, all black." Id. at 16. He further testified they all wore black masks during the robbery, and he rolled his mask up when he left the hotel room to search Brown's vehicle. Id. at 19-20.

He asserted he saw Kim "two days later and she was like, oh, my God, they got Pookie." Id. Fleming testified that he did not know who Pookie was at that time, but Kim described Pookie to Fleming in detail. Id. at 11. Because Fleming already had outstanding warrants for other robberies he committed, he decided not to tell police he robbed Brown and that Petitioner was innocent. Id. However, he hoped Morris or Genny Mae would have told police about Fleming's involvement. Id. at 12.

According to Fleming, police finally arrested him in August 2000, but police never questioned him about Brown's robbery. Id. He explained that after being incarcerated for a while, he began "changing his ways" and decided it was time to notify someone that Petitioner was innocent. Id. According to Fleming, he then realized he and Petitioner were housed in the same compound. Id. at 12, 14. Fleming explained he has never confronted Petitioner about his own guilt, and that Petitioner was unaware Fleming was confessing to the crime. Id.

11

at 13.

When asked why he waited until after the statute of limitations period to come forward, Fleming replied he was unaware of any limitations period. Id. Fleming was also unaware Petitioner previously wrote a letter indicating that Petitioner did commit the robbery and inquiring whether he would receive a lesser sentence if he disclosed the identities of the other individuals who participated in the robbery with him. Id. Fleming was also asked how he remembered the facts of this robbery so well when he admitted to committing a string of robberies in two different counties around the same time. Id. at 22. Fleming replied he remembered the details of all his robberies because he committed them solo. Id. He asserted he only committed this one robbery with others because Morris and Genny Mae were "doing bad" and Fleming needed to use Morris's stolen car. Id. at 22-23.

After he received Fleming's November 6, 2015, sworn testimony, Petitioner filed an all writs petition with the Florida Supreme Court on April 28, 2016, raising a claim of newly discovered evidence.[4] Resp. Ex. O. The Florida

---

[4] Petitioner was forced to file the claim with the Florida Supreme Court because the Eighteenth Judicial Circuit Court and the Fifth Circuit Court of Appeals had previously barred Petitioner from filing any further pro se pleadings pursuant to State v. Spencer, 751 So. 2d 47 (Fla. 1999). Resp. Ex. Q. In its response to this claim in state court, the state provided a detailed summary of Petitioner's extensive state court postconviction pleadings. Id. at 7-11.

Supreme Court treated the petition as a petition for writ of habeas corpus and ordered the state to respond. Resp. Ex. P. The state responded, Resp. Ex. Q, and Petitioner filed two replies, Resp. Exs. S-T. On November 15, 2016, the Florida Supreme Court issued a brief order denying the habeas petition "on the merits." Resp. Ex. U.

Petitioner then sought leave from the Eleventh Circuit Court of Appeals to raise this claim of actual innocence in a second or successive habeas petition.[5] Resp. at 12; see also In re: Boykins, No. 17-10100-G (11th Cir.). The Eleventh Circuit found Fleming's testimony qualified as newly discovered evidence under the statutory criteria of 28 U.S.C. § 2244(b)(2)(B)(i)-(ii); and explained "Boykins has at least presented a prima facia case that 'no reasonable factfinder' would have found him guilty had Fleming testified to his innocence at trial." In re: Boykins, No. 17-10100-G. This Petition followed.

## IV. Analysis

Petitioner's claim, raised in a second or successive federal habeas petition, is governed by 28 U.S.C. § 2244(b)(2). That statute provides:

> (2) A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless--

---

[5] In January 2004, Petitioner filed his initial § 2254 habeas petition. See Boykins v. Sec'y, Fla. Dep't of Corr., No. 3:04-cv-1013-J-32JBT (M.D. Fla.) (Doc. 1). The Court denied Petitioner's initial § 2254 on the merits. See id. (Order, Doc. (M.D. Fla. July 21, 2006). Petitioner did not appeal that denial.

13

> (A) the applicant shows that the claim relies on a new rule of constitutional law, made retroactive to cases on collateral review by the Supreme Court, that was previously unavailable; or
>
> (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and
>
> (ii) the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. § 2244(b)(2). In authorizing the filing of a second or successive petition, § 2244 restricts the appellate court to decide whether the petitioner has simply made out a prima facie case of compliance with the § 2244(b)(2) requirements. Jordan v. Sec'y, Dep't of Corr., 485 F.3d 1351, 1357 (11th Cir. 2007). If the appellate court makes that finding, the district court must then determine whether the petitioner's claim actually meets § 2244(b)(2)'s requirements. Id. at 1358 (explaining that the district court, unlike the appellate court, receives briefing from both sides, reviews the record, and has "the time to make and explain a decision about whether the petitioner's claim truly does meet the § 2244(b) requirements."). Indeed, the statute provides "[a] district court shall dismiss any claim presented in a second or successive application that a court of appeals has authorized to be filed unless the applicant shows that the claim satisfies the requirements of this section." §

14

2244(b)(4). It shall not give deference to the appellate court's prima facie finding, and it "is to decide the § 2244(b)(1) & (2) issues fresh, or in the legal vernacular, de novo." Jordan, 485 F.3d at 1358.

Here, Petitioner's claim is not based on a new rule of constitutional law as provided for under § 2244(b)(2)(A). As such, to survive dismissal, Petitioner must satisfy the two procedural requirements in § 2244(b)(2)(B). For purposes of this Order, the Court assumes Petitioner has satisfied the first procedural requirement of § 2244(b)(2)(B)(i) – that Fleming's November 6, 2015, sworn statement could not have been discovered previously through the exercise of due diligence at the time Petitioner filed his first federal habeas petition in 2004. See Boykins, No. 3:04-cv-1013-J-32JBT; see also Jordan, 485 F.3d at 1359 ("What matters under § 2244(b)(2)(B)(i) is whether [the petitioner], with the exercise of due diligence could have discovered [the facts he now presents to us] at the time he filed his first federal habeas petition.").

Petitioner, however, cannot satisfy the second procedural requirement in § 2244(b)(2)(B)(ii). Petitioner, relying on Herrera v. Collins, 506 U.S. 390 (1993), presents a freestanding actual innocence claim. Reply at 4. And in In re Davis, 565 F.3d 810 (2009), the Eleventh Circuit found an actual innocence claim cannot satisfy § 2244(b)(2)(B)(ii) unless it is accompanied by a constitutional violation. In re Davis, 565 F.3d at 824. Indeed, even if this claim were not presented in a second or successive petition, the Eleventh Circuit's precedent

15

"'forecloses habeas relief based on a prisoner's assertion that he is actually innocent of the crime of conviction 'absent an independent constitutional violation occurring in the underlying state criminal proceeding.'" Collins v. Sec'y, Fla. Dep't of Corr., 809 F. App'x 694, 696 (11th Cir. 2020) (quoting Raulerson v. Warden, 928 F.3d 987, 1004 (11th Cir. 2019)). Section 2244(b)(2)(B)(ii) requires Petitioner to allege a constitutional error, and his freestanding innocence claim is not itself considered a constitutional error. Thus, Petitioner's freestanding innocence claim is not cognizable in his second or successive habeas Petition.[6]

Nevertheless, even assuming Petitioner's actual innocence claim was cognizable in this proceeding, the Florida Supreme Court's adjudication of this claim "on the merits" would be afforded deference under 28 U.S.C. § 2254(d). That section provides that an application for a writ of habeas corpus should only issue if adjudication of the claim in state court "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C.

---

[6] While this is a correct statement of Eleventh Circuit precedent, this Court is not aware of a case in which a federal court found a person to be actually innocent but nevertheless denied habeas relief.

16

§ 2254(d).

In response to Petitioner's state habeas petition raising this claim of actual innocence, the state highlighted numerous critical inconsistencies between Fleming's testimony and Brown and Odom's eyewitness accounts of the robbery. Resp. Ex. Q at 16. It noted Brown never wavered in his identification of Petitioner as the man who held a gun to his head during the robbery. Id. at 16-17. Brown was also certain Petitioner and the other assailants did not wear masks during the attack, and Odom testified the man with the gun was wearing white shorts and no shirt. However, Fleming testified they all wore masks and dark clothing during the robbery. Fleming also claimed that he alone searched through Brown's car while the others held Brown in the hotel at gunpoint. However, Odom testified all the assailants left the hotel room together and the two men wearing dark clothing searched Brown's vehicle. Also, Fleming testified that Morris drove away from the scene in a grey vehicle, but Odom explained that a fifth individual drove up and picked up the other four individuals from the parking lot.

Brown and Odom also testified that the "scuffle" Brown and the gun-wielding assailant initially engaged in outside the hotel room was brief. However, Fleming gave a more exaggerated rendition, testifying that he and Brown "f[ell] over the balcony" before Fleming pulled Brown into the hotel room. Fleming also testified that during the robbery, Kim Davis "played the role as

17

i[f] she was being robbed too"; however, Brown testified he was not sure that Davis was even in the room during the robbery because he was lying face down on the ground. Brown also confidently identified Petitioner during his 911 call made immediately after the attack; and once police arrived on scene, Brown again informed police that Petitioner was one of the assailants.

All of the facts to which Fleming testified could have been obtained from a brief reading of the trial transcript or conversations with Petitioner, who was housed in the same compound as Fleming. However, as the state properly argued, Fleming's confession was materially inconsistent with key evidence presented at trial and "highly suspect because the statute of limitations has run so Fleming has nothing to lose in confessing to the crime." Id. It averred Fleming was not credible and his sworn statement would not weaken the case against Petitioner so as to give rise to a reasonable doubt as to Petitioner's culpability. Id. at 19-20. It also noted Petitioner has made numerous unsuccessful challenges to his conviction over the years, including another sworn statement from Morris that Brown paid Morris to testify at trial about the telephone calls. Id. at 19. The state explained that Morris's "lack of credibility was exposed at [an] evidentiary hearing, resulting in Morris invoking his right to remain silent in order to avoid the possibility of being charged with a crime." Id.

After considering the state's response and the evidence presented at trial, the Florida Supreme Court determined on the merits that Fleming's testimony

18

was insufficient to establish Petitioner's innocence. Resp. Ex. U. This Court affords deference to that finding and concludes that the state court's decision was not based on an unreasonable determination of the facts in light of the evidence presented to the state court. See 28 U.S.C. § 2254(d). Petitioner is not entitled to federal habeas relief on this claim.

Accordingly, it is

**ORDERED AND ADJUDGED:**

1. The Petition (Doc. 1) is **DISMISSED WITH PREJUDICE** and the case is **DISMISSED WITH PREJUDICE**.

2. The **Clerk of Court** shall enter judgment accordingly, terminate any pending motions, and close this case.

3. If Petitioner appeals this Order, the Court denies a certificate of appealability. Because the Court has determined that a certificate of appealability is not warranted, the **Clerk** shall terminate from the pending

motions report any motion to proceed on appeal as a pauper that may be filed in this case. Such termination shall serve as a denial of the motion.[7]

**DONE AND ORDERED** at Jacksonville, Florida, this 26th day of August, 2020.

*[signature]*

TIMOTHY J. CORRIGAN
United States District Judge

Jax-7

C: Anthony Boykins, #899339
Pamela J. Koller, Esq.

---

[7] The Court should issue a certificate of appealability only if the Petitioner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make this substantial showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," Tennard v. Dretke, 542 U.S. 274, 282 (2004) (quoting Slack v. McDaniel, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed further.'" Miller-El v. Cockrell, 537 U.S. 322, 335-36 (2003) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n.4 (1983)). Here, after consideration of the record as a whole, the Court will deny a certificate of appealability.